Case No. 16-1150. Ameren Services Company as agent for Union Electric Company, DBA, Ameren, Missouri, Ameren, Illinois Company, DBA, Ameren, Illinois, and Ameren Transmission Company of Illinois, and Elk of Petitioners v. Federal Energy Regulatory Commission. Mr. Thompson for the petitioners, Mr. Glad for the respondent. Good morning. Good morning. May it please the court, I'm Michael Thompson representing the petitioners, a group of utilities generally referred to as the MISO transmission owners, and the intervener supporting them, the Mid-Continent Independent System Operator, generally referred to as MISO. I'm reserving five minutes of my time for rebuttal, if I may. In the orders under review in this case, the FERC ordered MISO to modify its tariff, which was filed pursuant to Section 206 of the Federal Power Act, to comply with certain elements of FERC's Order 1000. Order 1000, in turn, was issued pursuant to Section 206 also, and directed the utilities under FERC's jurisdiction to follow certain principles related to the planning of transmission expansions and upgrades on their facilities across the nation. The TOs, or the transmission owners in MISO, contend that the FERC's orders in this case should be vacated and remanded, because the agency did not adequately confront arguments that we made in our request for rehearing of its initial order on the compliance filing before it, and because FERC did not, as the statute requires, make the findings that its imposed solution to the problem it perceived with the MISO tariff was just unreasonable itself. This case arises from the filing of a revised tariff to comply with the portions of Order 1000 that relate to inter-regional coordination of planning. Specifically, it arose from an agreement between MISO and a neighboring region called the Southeast Regional Transmission Planning Region, related to the development and how costs would be allocated for inter-regional projects, that is, projects that would entail facilities to be located in both MISO and the southeastern region. Can I ask a background, factual question, which is the MISO and the southeastern regionals, I don't know what the... SIRTEP, I think is the way people say it. So MISO and SIRTEP, they both submit a proposal as to how they're going to account for costs in the event that an inter-regional project is approved, so that you have to come up with some system for allocating costs between the two of them. Right. And then MISO proposes a system under which they exclude the approved projects. Right. In calculating the degree of benefits, which then begets the calculation of the cost avoidance advantage, MISO's proposal, which FERC then rejects, but MISO's proposal excludes approved projects from the field of vision. SIRTEP, as I understand it, includes approved projects. Why is there that mismatch? Doesn't it seem like it's already skewed? If one side is including approved projects and figuring out its cost share, and the other side who... There's only two entities here. We're going to divide it 50-50, 60-40, 70-30, whatever. We're going to come up with some system to divide us between the two of them. If one side is excluding approved projects and the other side is including approved projects, why does that happen? That seems odd to me. I think what you hit on, Your Honor, is one of the, what I'll call the complexities, I guess, of Order 1000. In the interregional coordination process under Order 1000, each pair of regions has to come up with a method of allocating costs for interregional projects between the regions. Right. But then each region separately comes up with a way of allocating the costs within that region, its share of the interregional costs. In this particular case, and the reason for that, Your Honor, I think it's fair to say, is because there can be differences between the internal regional planning processes in each region. Okay. And in this instance, what MISO proposed, as you said, was that an interregional project could displace a regional project in MISO only to the extent a regional project had not yet been approved by the MISO board. And that's really the heart of the issue here. Right. For cost allocation purposes. For cost allocation purposes. Yeah. That's right. And the reason for that, Your Honor, if I can sort of jump ahead here, is that in MISO, the process goes forward with MISO developing alternative projects that might be viable to serve various needs in its system, goes through stakeholder vetting of those projects. And in that course of events, we'll compare not only various regional alternatives, but also interregional alternatives that may arise. Then MISO determines from that process what to recommend to the board to approve. Once the board approves projects, they become a formal part of the MISO regional plan and listed in what's called Appendix A to the MISO plan. Once projects are in Appendix A, the MISO tariff requires MISO to designate the entity that's responsible for developing that project. And in many cases, that's the transmission owners who are involved here, but it can also be an independent developer. And, in fact, MISO in some cases puts projects out for competitive bidding and selects a developer through that process. But in any event, once a project is approved by the board and placed in Appendix A, there's an affirmative obligation under the tariff to go forward in good faith to finish that project, to complete it. Aren't there such projects right now that would be displaced by the interregional plan? Well, under these orders as it stands, Your Honor, every project currently listed in Appendix A is potentially susceptible to being bumped by an interregional plan. And to give you an example of the stakes here, Your Honor, for example, Entergy, which is just one of the- Are there any that you know will be displaced? No, sir. I don't know of any that- Doesn't that create a standing problem then? We think it does not, Your Honor. We rely on several precedents, particularly Idaho Power is one where this court recognized that where FERC issues an order that creates uncertainty where there previously was certainty, that that is a concrete injury to petitioner's interests and therefore gives it standing to challenge the FERC's orders. And in this case, Your Honor, there are literally dozens of projects, even in just the most recent MISO transmission plan. Entergy, for example, has nearly 50 projects in the 2017- just added in the 2017 MISO plan, in which it already has invested approximately $9 million and expects to eventually invest almost $800 million. So I'm missing something very basic here, which is why are we talking- The case is about cost allocation. Why are we talking about whether the projects ultimately- which projects ultimately may or may not be approved? Because it just seems like those are two potentially, at least conceptually distinct steps. One is you figure out what's going to factor into allocating costs between the two regions for an interregional project. That doesn't necessarily have to do with which projects are ultimately going to be approved. Then you have a separate step about which projects are going to be approved. We're only talking, as far as I know, we're only talking about the cost allocation step here. Right, but the reason we're talking- if I may, Your Honor. Yeah. The reason we're talking about that, Your Honor, is because FERC has required that in determining the cost allocation step. In this case, the cost allocation step is the allocation between the- Two regions. The portion of benefits in MISO is what we're looking at. Yeah. And the way MISO determines what those are. And FERC is saying you have to look at projects that are already approved and listed in Appendix A at that step. The transmission owners in MISO argued that that was unnecessarily disruptive of the process and harmful to developers like the transmission owners and even non-incumbent developers because of the commitments they make once projects are approved. But that- right there, you're talking about what's going to ultimately happen with the projects. And I guess my question is, when we're talking about the cost allocation formula, we're not necessarily talking about what's ultimately going to happen with the projects. We're only talking about a mathematical formula to determine how to apportion costs as between the two regions. But, Your Honor, I guess maybe what I need to explain is that the cost allocation step is important in determining whether the inter-regional project that's being evaluated meets the cost-benefit threshold for going forward in MISO and the southeastern region. And so if- by definition under this process, if the cost-benefit threshold is met and by virtue of having looked at projects already in Appendix A, it might be met based on assumption that the inter-regional project will replace something that's in Appendix A. Well, then the inter-regional project should go forward at that point in lieu of- presumably in lieu of the regional project that's already in Appendix A. The cost-benefit threshold is what exactly? 1.25. And where is that? I'm sorry? Where is that? Where would I find it? I'll have to look up the exact record site. I'm sorry, I don't have it in my fingertips. I don't think I- I don't remember that being referenced in the briefing, but maybe I'm wrong. Maybe that's just an assumption that everybody understands. I know it's in- at least in the Commission's orders. I don't know if it's in the briefs. What- Mr.- what I'm struggling with as I hear your argument is- I mean, okay, I understand your answer to Judge Srinivasan, but even accepting that, what you're asking us to do is second-guess- and we have a very deferential standard review in cases like this, right? I mean, you cite- you cite Pacific Gas and Electric in your brief, arbitrary and capricious standard. It's all very deferential. You're asking us to second-guess the Commission's judgment about what elements go into a cost allocation formula. That just seems to me not the kind of thing we do without some very powerful argument that it's illegal or arbitrary and capricious. What- what is- what is your very best argument that this is something we should- we should worry about?  The first is that the Commission did not squarely address the arguments that we made over the hearing about the harms- But it did address them. It's choice in how to apply the allocation- Yeah, but it did address them. You just don't like its answer. It did respond to your arguments, didn't it? You just- you just don't like its response. Well, for the reasons we've explained in our briefs, and I'll be happy to go into it again, if you like, Your Honor, we think they actually did not directly address those harms. Uh-huh. And much of the reason- for example, the Commission cited the provisions in Lyson's tariff that it said provide for the reassignment of projects. Now, those provisions, in fact, Your Honor, are very narrow- much narrower than the circumstances in which the Commission's order potentially could require displacement of a project already listed in Appendix A. They apply only in circumstances that are really under the developer's control. If the developer goes bankrupt, if its qualifications to proceed with the project are changed, or if it runs into problems getting regulatory approvals, cost overruns, or other circumstances that might prevent completion of the project. And in that event, MISO will reevaluate the project and look for a way of mitigating the problem. It doesn't necessarily reassign the project. In this case, FERC has created a risk that every project listed in Appendix A potentially might have to be replaced, or could be replaced, by an inter-regional project. And because developers who are designated to build projects listed in Appendix A incur costs related to engineering, design, environmental approvals, regulatory approvals, lining up supply equipment and contractors, et cetera. In addition, if MISO- Well, excuse me, but since one of your answers, I think you answered Judge Griffith, that there's no specific project that we know will be displaced. So we're talking about future projects that get approved. Won't developers or everybody else who's involved in this- We deny the petition here, and MISO is required to include approved projects. Won't developers and others simply take that risk into account in terms of how they cost their projects? Presumably they will, Your Honor, which is one of the problems we raised. But doesn't that sort of answer the question? That risk will be built into the process, won't it? The issue with that, Your Honor, is presumably going forward it would. But, one, that raises costs to consumers. Second, it doesn't answer the problem- But that's- I mean, once you say that- It's already approved by the board. All right. I'm sorry, Your Honor. That's okay. Never mind. Thank you. Okay. I mentioned to you, Judge Tatel, that there were two reasons why we think the commission should be reversed. One is what I mentioned. The second one is that the commission failed to make the findings required by Section 206, that its formulation or its application of the cost allocation method, in this case, is just and reasonable. This Court's been very stringent in ensuring that FERC understands the distinction between 205 and 206 and makes the findings, in particular, that Section 206 requires. In this case, the commission failed to do that. Okay. The commission's argument, in this case, that it didn't have to do that because Order 1000 purportedly resolved this issue is incorrect. In particular, Your Honor, we point you to the decision in the City of Cleveland v. FERC, where the Court held that when a compliance directive is not definitive or not specific, then the determination of justness and reasonableness is deferred until the order on the compliance filing. And that's the stage at which the orders were issued in this case, Your Honor, and they don't make the Section 206 findings. Okay. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Nicholas Gladd for the commission. I'd like to start out by addressing Judge Srinivasan's point about what is actually going on, what is at issue in this order. And it is not displacement that has not been directed by this compliance proceeding or Order 1000. Order 1000 set in place a framework whereby displacement is a possibility as a result of these planning processes and requirements and cost allocation requirements. These compliance proceedings then set forth, for purposes of this appeal, the method for calculating the benefits of an interregional project. So what the transmission owners are really concerned about here is that this benefits calculation is going to produce information that may eventually be used to indicate that an interregional project is superior to a regional project that has already been approved. So if there is any displacement that occurs in the future, its only connection to these orders is that these orders put in place a calculation that indicates some sort of So why is it the case that everybody seems to be assuming this is true, that if approved projects are excluded from the field of vision for purposes of cost allocation, that necessarily means that approved projects can't be displaced when you get to the point of picking which projects to approve? Why is that? I get that everybody is assuming that. Your brief assumes that. The way you're discussing it assumes that. Is it because of this 1.25 cost-benefit ratio? Or what's the connection between those two steps? I'm not sure I exactly understand your question. Let me ask the question this way. Maybe the question is missing such a basic assumption that it's often left field. You can have a situation in which the cost allocation formula is just 50-50. It's not grounded in anything. It's just that on average, these are roughly divided 50-50. So that's just going to be the cost allocation formula. And then we're going to go and pick which projects are going to be approved. And for that, we have to do a bunch of calculations to decide whether it makes sense to displace either an approved project or an identified but as yet unapproved project. But what that shows is that there's not necessarily a linkage between the cost allocation formula and the determination whether to approve or disapprove a project, an inter-regional project. That's what I'm not quite understanding is that it seems like the assumption across the board is that if one were to exclude approved projects from the relevant field of projects for purposes of cost allocation, that necessarily means that approved projects can't be displaced when you're talking about determining whether to approve an inter-regional project. And that's what I'm missing. There's got to be some association between those two stages, the cost allocation and then the ultimate decision whether to approve or disapprove an inter-regional project. Okay. I think I see your concern. And I think the linkage is that if you can't include in that benefits calculation the already approved projects, then the benefits that you're quantifying through that method are not the benefits of the most efficient or cost-effective solution. And therefore, because you're using an avoided cost-only method for quantifying the inter-regional project's benefits, the inter-regional project's benefits are going to be under-inflated or understated because they're not reflecting the most efficient or cost-effective solution. So what that assumes is that when you're doing the cost-benefit calculation for purposes of cost allocation, you're going to use the same methodology when you're deciding whether to approve or disapprove a project. Is that just what happens? You could do something totally different. Conceptually, it seems to me you could do something totally different. You could decide for cost allocation purposes, we're going to figure out the benefits in one fashion. And then when we're getting to the stage of deciding whether to approve or disapprove a project, we're going to do cost-benefit analysis in a different way. But is it just understood that actually there's no conceivable distinction between those two, that the same considerations are going to inform understanding the degree of benefits for purposes of figuring out cost allocation and for purposes of figuring out whether it makes sense to go forward with the project? Yes. I think they are the same in that this is the information developed in this proceeding. These cost allocation principles are going to be the metrics for determining whether project displacement occurs in the future. But project displacement is not a foregone conclusion, even if you're looking at this information generated by this compliance filing. The Commission hasn't addressed the issue of whether and when a project should or shouldn't be displaced. Yeah, I get that. I get the point. I think I get the point that we don't know yet whether a project is going to be displaced because there has to be a lot more stuff that has to happen before that determination is made. I guess I just wasn't understanding necessarily that the same cost-benefit calculus that informs the determination of cost for purposes of cost allocation as between the two regions is the determination that determines whether to go forward with the project at the end of the day. It's one piece of that analysis. Another piece, which is key, is what you picked up on in discussion with my friends, and that's the net benefits test, the benefit-cost ratio of 1.25%. And that's at JA-226, the first order, paragraph 172. And the practical effect of that 1.25 benefit-to-cost ratio is that not just any interregional project can displace a regional project. Even if you find an interregional project that could satisfy the same transmission needs, because of that ratio, which is also referred to as a net benefits test, that interregional project, which is going to be bigger, that's interregional, will also have to be at least 20% cheaper than the interregional project or projects it's displacing. And that tips the scale against displacement. So I want to follow up on one of your questions. So did I understand from what you said to Judge Srinivasan that the ultimate question of whether there are any limits on what types of approved projects can be displaced and not displaced hasn't been decided? Is that right? That's right. So, for example, suppose there's a project that's completely approved and it's 90% complete. Is it that that could be displaced? The Commission hasn't resolved that question. Is that right? That's correct, Your Honor. That project could be subject to displacement, but it's not a foregone conclusion that it would be displaced. And if it is displaced, I realize we're going beyond what's before us. But suppose it is displaced. Are there methods for compensating the developer for the 85% of the costs the developer has put into developing the project? That goes to the scope of Order 1000, and the Commission said clearly that cost recovery is beyond the scope. And the reason that's the case is because cost recovery is handled through each individual transmission owner's formula rate. And so at any time, before, during, and after this proceeding, the transmission owners and the system operator have the power to come in to the Commission and present a tariff filing if they think that these types of costs are not recoverable under the current rate. I see. For standing purposes, though, it seems like it could make a difference whether displacement of an approved project is even possible. Because I think what Misa's argument would be, I take it, is that, look, we'd like a proposal under which displacement of approved projects is just not possible. And then FERC comes along and says, no, that's not acceptable. You have to at least allow for the possibility of displacement of approved projects. Whether that's in fact going to happen, we'll defer to that issue. We don't know that yet. But at least have to allow for the possibility of displacement of an approved project. So far I'm understanding it correctly. Yes, that's correct. So then Misa's argument would be, at least for standing purposes, put aside what's going to happen on the merits. But for standing purposes, once we know that displacement of approved projects is possible, that has current implications for investor expectations and all sorts of other things. It's true that we don't know yet. Let's just hypothesize. It's true that we don't know yet whether in fact project displacement of an approved project is going to happen. But once we know that it could happen, that has a current real-world effect on us, which gives us enough of a concrete interest to go forward with the case. It may or may not mean that we win on the merits at the end of the day, but it does mean that we have enough of a concrete interest as a result of this choice between including approved projects or excluding approved projects that they're standing. I think that's right, Your Honor. But the key here is that they're not alleging real-world impacts. They're alleging just uncertainty at this stage. No, but they've been ordered to revise their tariff, right? No, Your Honor. Only the system operator has been ordered to revise its tariff, and it's not a petitioner here. It's an intervener. Yeah. And is that the distinction? Yeah, that was my question. So MISO would have standing, would it? Yes, I think MISO would have standing. This is its tariff, and it's the object of the commission action. Do transmission owners own the facilities that the tariff covers? Transmission owners are entities that provide service pursuant to the system operator's tariff. Right, pursuant to a tariff that the commission has ordered revised, right? No, there's a tariff that they operate under. The commission has ordered the tariff they operate under to be revised, right? Correct. And why isn't that sufficient for standing and rightness? I mean, we don't really need any more information, do we, to know how to review this question of whether or not approved projects should be included or not. That's the only question before us, correct? That's it. That's the only question. I'm sorry, can you restate the only question? I was combining rightness and standing by saying, look, they've been ordered. They are operating pursuant to a tariff that the commission has ordered to be revised. And the legal issue before us is whether or not being ordered to include approved projects in it is lawful or not. So, A, they're injured because they're operating under a tariff that has to be revised, and, B, there's a clear legal issue that we don't really need any more information, right? No, Your Honor, I don't think that's the standard. Tell me why. Because, one, I'm not aware of any case that says you have standing just because you take service under a tariff that was revised. Well, but they're also ordering it just increases their risks, right? Right, I think that's a separate. It affects the planning process, their planning process, correct? Yes, but I think they're distinct issues. There's a threshold question of whether a third party can be the object of the commission action when the commission changes a specific tariff. I'm not aware of any case that says just because you take or provide service under a tariff that's changed, it's not yours, you have standing. The implications of that are pretty wide-ranging. Yeah. The second issue is, independent of whether you're an object of the commission action, you can have standing because of uncertainty that's created. And I think the answer to the first question is, no, they're not an object. The answer to the second question is, under this Court's precedent in the Union Power Generators case, under New England Regional Interconnect, this type of uncertainty that's not particularized to any individual, it's applicable to any transmission developer in the region, is not sufficient to converse the injury in effect for standing. Can I ask this as a – part of this at least turns on the language of the Federal Power Act, which requires – which calls – which allows for review for agreed parties. So if you – it sounds like you acknowledge that MISO would be an agreed party. Yes. Withstanding, so they can bring it. Yes. And then the question is, what's the basis for drawing a distinction between MISO and the transmission owners that make up MISO? And I guess you would also allow that in certain circumstances the underlying transmission owners would be agreed parties, even if what they're complaining about is a change to a tariff that applies directly only to MISO. Yes, that's correct. So that conceptually could happen. Yes. So they could be agreed parties. So what we're talking about here is, is there a difference between the degree to which MISO is agreed and the degree to which the transmission owners who make up MISO is agreed, sufficient to deny the underlying transmission owners agreed party status? That's what we're really talking about. That's what we're really talking about. And relatedly, the burden to prove standing is, I think, heightened when it's a third party not – when the third party is bringing the claim, not the entity whose tariff is at issue. And I would argue that under CR Club DEPA, this Court's precedent, the burden is to show each element of standing through affidavit or other evidence, and mere allegations in a brief are not sufficient. And all we have here are mere allegations in a brief that generally they may have a project that could be subject to displacement. They haven't identified any specific project that they've been granted. And also to Judge Griffith's earlier question, not only have they not identified any projects that they have that have been approved that are subject to displacement, but to date there have been no interregional projects proposed in this region, period. So there's no project that yet could do any displacement. Anything else? No. No further questions? Well, I don't think so. Thank you. Thank you. Was – Mr. Thompson's out of time, right? How many? Sixty. Sixty. Six seconds. Oh, six seconds. Okay. You can have two minutes and six seconds, but I'm going to use up your six seconds and ask you, six of them, to respond to this standing argument that we just heard and particularly the point that at this stage you need – the allegations in your brief are not sufficient to support standing, that you needed affidavits at this point. Well, the first thing I'd say about that, Your Honor, is this is the first time we've heard it in this case. It wasn't included in the Commission's brief. Well, they did argue you lack standing. They did make that argument. We responded to it, Your Honor. Frankly, Your Honor, we were surprised the argument was even made because the transmission owners own the facilities that MISO operates under its tariff. They are subject to the tariff. For the Commission to suggest that the transmission owners whose facilities are involved and whose facilities are the subject of the expansions and upgrades that are directly implicated by the planning process and the cost allegations that are at issue here Okay. Why don't you go on to the points about the merits you'd like to make. I thank my friend for giving you the record reference in the order. You can also find it in the tariff at JA139-455. Thanks. I guess a couple of points very quickly here. There were questions for counsel about what happens if a project eventually is displaced. Can an owner come in and ask for cost recovery? And sure, the transmission owners do have the right to come in and make Section 205 filings. Of course, there's no guarantee that those filings will be approved. None of this is before us now, correct? Although I suppose this affects, this all relates to the question of risk, correct? I believe that's right, Your Honor. The only point I want to make in addition to that is the Commission's general policy, which has been in place for a long time, is that utilities are entitled to recover only 50% of the costs of abandoned projects from ratepayers unless, in advance, they get approval for incentive treatment that would permit them to recover more than that. Okay. All right. Let's see. We also hear argument to the extent that cost recovery is beyond the scope of Order 1000. And I guess what I'd suggest is if the Court does concur with the Commission's view on standing, we would ask the Court to ensure that the Commission is not going to argue in a future case that the transmission owners would be collaterally stopped from coming in to seek recovery of the costs that we contend they have put at risk with these orders in this case. All right. Okay. And with that, I'll ask the Court, please, to grant the petition for review. Okay. Thank you both. The case is submitted.
judges: Tatel, Griffith, Srinivasan